v. Al-Maliki v. Clay v. Al-Maliki v. Al-Maliki v. Al-Maliki v. Al-Maliki v. Al-Maliki v. Al-Maliki v. Al-Maliki v. Al-Maliki v. Al-Maliki v. Al-Maliki v. Al-Maliki v. Al-Maliki v. Al-Maliki Could Texas criminalize that? I think Texas criminalizing that would present interesting questions related to the sovereignty of Mexico and what Mexico could prosecute. They're not going to Ciudad Juarez to arrest anybody. They wait for my three hypothetical perpetrators to return to El Paso. They arrest them in El Paso, prosecute them in Texas state court for sexually assaulting minors in Ciudad Juarez. I think as a resident of the state of Texas, Texas could, in fact, prosecute. Okay. Now, Arizona, similar case, different people crossing the border into Mexico. Arizona could punish those people in Arizona state court, correct? I'm sorry. Did you say into New Mexico or Mexico? No, Mexico. Into Mexico? Yeah. I think they could. And California could if people were going down to Tijuana, correct? Correct. Okay. So now you've got three states criminalizing the sexual abuse of minors that occurs in the country of Mexico, and those statutes probably would not all be identical. They would have variations in them. Isn't that precisely the evil that the Foreign Commerce Clause, as interpreted in Japan lines, was intending to address? Namely, that the federal government has a right to speak with, quote, one voice on these types of issues. Well, I think, Your Honor, your hypothetical takes this well outside the scope of commerce. And so to the extent that it might not implicate the one voice issue, which relates to the Foreign Commerce Clause, our position here is that this type of regulation exceeds the authority, Congress's authority under the Foreign Commerce Clause, because quite simply, incest does not involve commerce. Let's try one that does involve commerce. States have, the federal government has controlled substances laws, drug laws. Let's say someone from Missouri goes to the Netherlands and starts using a bunch of drugs, you know, where there aren't so many laws. Could he be prosecuted when he comes back under a state law or a federal law for drug violations? I think on the federal law aspect of your question, Judge Porter, that that's an easy answer, and that could be no, because again, Congress does not possess plenary police power to exercise criminal law authority over U.S. citizens traveling abroad merely by virtue of the fact that they've traveled. What about Missouri? With respect to Missouri, again, under the 10th Amendment, I think there is a broader authority held by the states that would allow the states to exercise authority over their citizens. Over the drug use in the Netherlands? Potentially, yes. What if Americans going to foreign countries and using drugs is not an international problem? What if Americans going to foreign countries and eating foie gras or jaywalking are not international problems? But we know, I think you'll agree, the sexual exploitation of minors abroad is widely recognized as an international problem. Doesn't that make it different than jaywalking, foie gras, or going to Netherlands? Well, Your Honor, as I think we outlined in our brief, that analysis is not tethered to any analysis of whether a particular enactment of Congress, and I presume we're talking about Congress here, is valid under any provision in the Constitution. And I think that's an important point, that the government's brief points to a lot of reasons why Congress did what it did. But that's not for time immemorial. That has never been the test for what courts must determine is a constitutional enactment by Congress. Right. But I guess what I'm driving at with my question about something being an international problem is that if the sexual exploitation of children worldwide is an international problem, and that international problem puts a lot of money in a lot of people's pockets, there's at least some commercial relationship there. Now, I understand that you've got somewhat of a stronger argument, perhaps, than Mr. Pendleton had on behalf of your client, because Pendleton went to Germany and sexually exploited children. It wasn't incest, right? You mentioned the word incest at the beginning here. So you're on a little bit of a better footing than Pendleton was. But isn't it true that this law, subsection C, was Congress's effort to close a loophole and a gap to deal with an international criminal issue that directly involves a tremendous amount of commerce? Because people drive to foreign countries. They fly to foreign countries. They stay in hotels. They spend all kinds of money to accomplish their assorted goals of sexually abusing children. So there's clearly some element of commerce here. And I guess your response is it's not enough of a nexus? Or help us with that. I think that's part of it, Your Honor, is there is a lack of a nexus here. And Lopez teaches us that stacking inference upon inference upon inference is not enough to create a connection to, in Lopez, interstate commerce. But if we're looking at that framework, then to foreign commerce. But I think, more importantly, Your Honor, subsection C addresses conduct. And the conduct that you've discussed in your hypothetical relates to conduct that would be covered under subsection B of 2423. And so there's a bit of a disconnect there when Congress is discussing. Yeah, but C is to close the loophole, right? I mean, the reason they pass C, as I understand it, is that under B, if an American flew to Germany with the intent of sexually abusing a minor and paid money to the minor, that's covered by B, correct? Right. Well, the people that engage in this behavior, and some studies indicate that 25 percent of the culprits are Americans worldwide, they got pretty wise to B. And they were doing an end run around B by, for example, renting a room somewhere and paying the owner of the lodging a multiple of the fair market value of the nightly rate with a wink and a nod, knowing that that person was going to procure a minor for that guest to abuse. Seems like a pretty rational effort by Congress to close a gaping hole in the efforts to fight sex trafficking and the sexual exploitation of minors abroad. What am I missing about that? Well, and once again, Your Honor, and I see my time is up. No, go, go. You're on our time. Keep going. I see with respect to your hypothetical, the booking of the room, evidence is an intent at the time that individual left the United States. That's subsection B. The other point that I would make on your hypothetical, Your Honor, is Justice Thomas in both the Kibidoh and the Comstock decisions has repeatedly said that not only is the United States not to be the world's police force and going out and enforcing its laws extraterritorially, but it's not the job of the United States to make sure that every individual who could potentially slip through the cracks is caught. And ultimately, at the end of the day, the benchmark by which all these statutes needs to be evaluated is whether they are within the confines of the limited enumerated powers that Congress has under the Constitution. And here, the facts simply go beyond that. Yeah, I'm just not sure Justice Thomas's view gets you anywhere on this. Isn't his view on the scope of the Domestic Commerce Clause and the Foreign Commerce Clause the minority view? It's not the view of the Court. He's taken what I understand to be a very credible assessment of the scope of commerce as a matter of original public meeting at the time of the founding. But when you read cases of the Supreme Court, they seem to disagree with Justice Thomas's approach, don't they? In part, Your Honor. Especially Lopez. I mean, substantial effects test, that's far afield from Justice Thomas's view of the proper scope of the Commerce Clause, right? That's true. But again, that's interstate commerce. And as this Court recognized in Pendleton, as you recognized in Pendleton, Your Honor, the Supreme Court has not spoken on the breadth of the Foreign Commerce Clause, certainly. If Pendleton is your obstacle here, how would you suggest we work around Pendleton? I mean, was Pendleton's error adopting the Lopez framework in the first place, or the way in which it handled the Lopez framework? What do we do with Pendleton? I don't see Pendleton as an obstacle, Your Honor. As you know, that was a facial challenge. I think Pendleton was also decided well before many of the other cases that have addressed this type of situation and this type of specific challenge. And in the context of the Pendleton facial challenge, the decision to follow the channels analysis under Lopez, while Judge Hardeman pointed out that was not a decision that's binding to follow Lopez stemming from Pendleton, there the facts did not require the Court to go beyond the channels analysis and look at the specific types of non-economic conduct that are at issue here. And in particular, I would point to the language from Heart of Atlanta that requires under the channels analysis, preventing the injurious and immoral uses of the channels of commerce. And here, the disconnect between the travel, whatever travel Mr. Clay may have engaged in, and the actual conduct is quite a broad gulf. And as applied to Mr. Clay's conduct, there simply was no regulation of the channels of conduct. So I think either under an original meaning of the word commerce as used in the foreign commerce clause, or under the Lopez framework, as we outlined in our brief, is more than sufficient to find that 2423 was unconstitutional. Necessary and proper for a minute. Why isn't Holland another roadblock there? Missouri v. Holland. I think Holland, Your Honor, the language that you're referencing from Missouri versus Holland is very broad. Some have characterized it as little more than Ipsi Dixit. And ultimately, let's say I agree with that. So what? Well, I think Judge Kesslidge's opinion showed, if not disdain, at least strong skepticism for the correctness of Holland. But yet, the defendant who is similarly situated, your client here, still lost in the Sixth Circuit in Rife on the strength of Holland. I think, Your Honor, you hit the nail on the head. And if I could call any opinion as evidencing being dragged, kicking, and screaming across the finish line, the Rife decision would be that. I take a slightly different view of Holland, though, in the sense that it doesn't provide the type of analysis that a court should engage in as it relates to determining, ultimately, the question here, which is whether 2423C was ever intended to implement the optional protocol. That line was more like non-binding dicta. I think so. And I think the discussion that's out there evidences that in the sense that courts do not issue one-page orders that simply say, see Missouri v. Holland, case closed. A few years ago, it was all teed up for the Supreme Court to take on Missouri v. Holland, and they passed. Should that weigh into our consideration of that case? This is the Bond case, Your Honor? Yeah. I don't believe so. I think that, again, Missouri v. Holland addressed a very specific set of circumstances where the statute that was in question was for the Migratory Bird Treaty. And so as a result, I think here there's more analysis that needs to occur. Missouri v. Holland does not provide that. And if anything, the record here, at least from Congress's perspective, would strongly suggest that the optional protocol was not what it was based on as the STPIA statute, the predecessor statute to the PROTECT Act, specifically relied on foreign commerce as the basis for enacting it. Now, we don't have a similar statement under the PROTECT Act, but I think the two can be read to suggest that the optional protocol, which I would also note, Your Honor, does not address the type of conduct that is at issue here, was not in Congress's mind. If we agreed with you it wasn't in Congress's mind, we still have to deal with the language. It's almost a battle between original intent and textualism, isn't it? Because I think you've made a pretty compelling argument in your papers as to why it wasn't in Congress's mind, what you just said now. But it doesn't mean it's not covered by the language of the statute. Does that save it? I'm sorry, the language of the 2423C? Yeah. That the optional protocol was not- In other words, does- in order for something to be valid under the treaty power, is it the intent that matters or the language that matters? I think here, Your Honor, without- I think here, ultimately, neither are met. So this Court doesn't need to determine that because the intent- let me ask it a clearer way, perhaps. Is it your argument that for a congressional enactment to be valid under the treaty power, that congressional enactment specifically has to- a plain statement rule, let's call it- the act of Congress has to say, we are passing- and they do this from time to time- we are passing this law to implement X treaty? I don't think a plain statement rule is absolutely necessary, Your Honor. But I think- and I'm referencing here the Belfast case- the treaty language does not have to mirror the purported implementing statutes identically, but they have to overlap in all material respects. And I think the argument here, Your Honor, is that noncommercial conduct is simply not- is material, and it's simply not covered by the language of the optional protocol, which refers to solely the sale of children, child prostitution, and child pornography. Those are all economic aspects of conduct that 2423C goes far beyond. And as it would- as it plays out here, Your Honor, I think the risk- and this risk is seen in Justice Thomas's- Why is it- why is the cleavage so obvious? I mean, your client, I believe, in the record, there was evidence that when your client sort of descended into depression and terrible thoughts, he was consuming a lot of pornography online, wasn't he? And then it went from that to conduct. I- that's correct, Your Honor. I think here, is it so unusual or so implausible to say that those dots can be connected? As applied here, Your Honor, I think that- the explanation- I don't want to say story in a pejorative way. The explanation, as I understand it, is- and you know these facts better than I do, so correct me if I'm mistaken- is that my wife left me. We were working in a poor country, tending to people. We had children. She abandoned me. I was lonely. There were natural disasters, poverty everywhere, PTSD from witnessing terrible tragedies in Haiti, and my wife left me. And I was despondent, lonely, and I started consuming pornography. And next thing I know, my child is in my bed with me, and I sexually abused my child. Was that- is that what happened here? I- that- that's correct, Your Honor. I- I think that the- So then- then if that's correct, then why isn't the optional protocols intent to help mitigate, to the extent possible, the international problems of child sex tourism, child pornography, et cetera? What- why- why isn't it all sort of part of the same ilk? I- I guess I'm- I'm challenging the notion that- that there's a clear line of debarkation between all of what the optional protocol is intended- the evils that that optional protocol is intended to- to mitigate with the sexual abuse that occurred here. Well, I think, as an initial matter, Your Honor, I- the- the record does not support a finding that there was child pornography in any respect here. So I think now- Just pornography. Correct. Okay. And- and I think that can be taken outside the scope. And- and once you narrow it to the narrower scope of child pornography, I think, you know, you're- you're- you're- the discussion then is about an economic object that can be used, whether that's purchased or traded or things of that nature. And so, again, I think we circle right back to, number one, there has to be support in the Constitution for any congressional enactment. The treaty doesn't set those boundaries. But beyond that, you have economic conduct. And here, the disparate- the- the- the disconnect between economic conduct and non-economic conduct is- is simply too great to satisfy any constitutional standard. The indictment charges violation of both the traveled in and the resided in prong, right, of the statute. And Mr. Clay pled guilty to the whole thing. So we'd have to win on both prongs. Yeah. All right. Thank you, Mr. Mazur. We'll hear you on rebuttal. Thank you. Ms. Raulston? Good morning, Your Honors. May it please the Court, Sonia Raulston for the United States. I'd like to pick up where you just left off, that he pled open to the indictment. He pled to both prongs of the indictment, including the travel prong. At this point in the proceeding, he cannot raise a sufficiency argument, i.e. that his conduct does not meet the statutory definition of travel. And under Pendleton, that's enough. You can start and end there. The defendant traveled in foreign commerce, just like the defendant in Pendleton. He engaged in non-commercial, non-quid pro quo sexual abuse of a minor under subsection F1, the same charge as in Pendleton. And therefore, it is a regulation of the channels of foreign commerce. That's all you need to do. We've had a very interesting, you've had a very interesting discussion so far this morning, and I welcome the opportunity to respond to some of that. But if you're looking for the easiest way out of this case, that's it, which is essentially exactly what the district court did as well, and I think her very thoughtful opinion. I'd like to take a moment to talk about the Rice case. And we didn't go through this as fully in our response brief, because the defendant didn't cite the Rice case at all, let alone engage with its reasoning in his opening brief. But I would say, I think, five things about Judge Kalfich's criticism of our argument there. First, he rejected the Lopez framework, which this court in Pendleton adopted. Indeed, the Pendleton decision discusses whether to go broader, as some of the other courts ended up doing in Bollinger and Durham, and the Ninth Circuit had already done in Clark. And so we don't have to go that far yet, but we'll start with Lopez. So I think that that actually is binding. I think that's the basis of the court's decision there, because it adopts this channels analysis. So I don't think that you can go as far as Judge Kalfich wanted to go. Second, the history involved in Judge Kalfich's opinion, again, was not raised in the defendant's brief. And the following three reasons are why Judge Kalfich was wrong about that history. First, is that he cites- Sorry, what did you say shows that Judge Kalfich is wrong about the history? I'm going to give you three reasons. Oh, okay. The first is that founding area dictionaries are not as explicit as he suggests. He cites a single dictionary to say that commerce is financial. I can give you a list of eight dictionaries, three at least of which talk explicitly about correspondence or interchange or discussion across with others as a part of commerce, which I think plays into this idea of federal regulation with one voice with other countries. Second, there are founding era statutes that invoke the nationality principle under international law. They're not explicitly tied to Article 1, Section 8 powers. I give you the 1789 Judiciary Act, which includes a prohibition on treason committed anywhere in the world by a U.S. citizen based solely on the nationality principle. And then the 1799 Logan Act, which remains in force. It prohibits private diplomacy by U.S. nationals abroad, again, implicating the foreign relations constellation of foreign relations powers. And so those are founding era statutes that passed by the framers that they thought were constitutional. So I think that that indicates that they believed at least Congress had the power. And then the third thing is, as the Supreme Court said in the Blackmare case,  I think that goes to what's long been recognized in foreign relations law, dating back to the Curtis Wright decision in the early 1800s, that Congress, as it's a federal government between the president and the Congress, the political branches, possess this authority to... Sorry, I just want to be clear about Blackmare. The power is inherent in sovereignty, except it's otherwise explicitly limited by the Constitution. So I would say federalism, the Bill of Rights, they can't change the structure of the government, Blackmare says, but it starts from this premise of the powers inherent in sovereignty. And foreign relations is probably the preeminent one of those powers. When you look at the Lopez, Morrison, and Reich, the takeaway that I get is that somehow there has to be some type of economic in nature content. And the concern that people have, just certainly on its face, is what is the commercial aspect of Mr. Clay's conduct? The commercial aspect of this conduct, as in Reich, is that it affects the broader market. So there is, I think everyone agrees, there is a global market for sex tourism, child prostitution, the exploitation of children that we rarely can prove involves the quid pro quo exchange of money. The victims are rarely the people who receive the money. And so even when we hear from victims, we have a hard time proving that, or proving the connection, as your honor suggested, that people have stayed in the hotels with this tacit understanding. And we can't prove that that was a quid pro quo under it too. But how did Mr. Clay's conduct contribute to this global market? So again, I want to say this rational basis review of Congress's, whether Congress could have any rational basis to conclude that the... Okay, what's the rational basis argument for Mr. Clay's adopted daughter? That we have this market, and the market is for pedophilic interaction, commercial interaction with people, that pedophiles in particular are driven by these psychological urges, and that they satisfy them in the easiest way possible. Sometimes that's in the commercial market, but if they have other means available, they might take them. Put another way, if he had no children, he would have, your theory of the case is, he would have engaged in the same conduct with somebody unrelated. Yes, that's right. Seems like a stretch on the facts of this case. But I don't know. Well, so I think a couple of things. One, this discussion below, and I was looking for the exact citation, but I couldn't find it. I think it's at the sentencing hearing, which unfortunately the transcript isn't searchable. Where they talk about, you know, he didn't have to do this. There was prostitution available if he was in need of sexual contact. And I think that that idea of, if you didn't have it in the home, there's a market, right? That it's all related. And I would point specifically to the facts, for example, of the Bianchi case. From this court, it's an unpublished decision. And also the Reid case that my friend on the other side likes to rely on. Both of those cases involve both F2 and F1 conduct. So the quid pro quo commercial and the F1 non-commercial. And I think that's showing that these defendants don't just engage in one kind of conduct. You're talking about people who are engaging in the conduct of sexually exploiting children. Sometimes without quid pro quo. Sometimes with. That this market is all related. And I think as in Raich, when there is a comprehensive prohibition on a certain market, that Congress, as Justice Scalia said, has the authority to make the regulation effective, right? To do the prophylaxis to make the regulation effective. And I'd like to point out that you don't have to rely just on the foreign commerce power, right? It's all of the powers taken together. The question is whether Congress has power, right? Whether Congress has power under one pigeonhole part of the Constitution. So you look at foreign commerce. You look at the treaty power. You look at the broad foreign relations power. And I think also you can look at international law. And that makes it quite similar to the Bracken case that the Supreme Court decided last term about Congress's authority to regulate Native American issues. In that case, we're even dealing with overcoming a federalism presumption of state regulation of child adoption law. Here, of course, we don't have federalism concerns. And even if we did have international sovereignty concerns, first of all, the political branches of the federal government are the right place to resolve those. And secondly, here we have a demonstrated record of other countries coming to the United States and saying, help us. Yeah, we are in some ways the problem. And other countries are having trouble protecting their own citizens because of the behavior of American citizens. I get all that. But what I struggle with is, and Judge Keflage struggled with, is apparently in that argument, the government was unable to articulate a limiting principle. And I can't imagine that the Supreme Court of the United States would say that Congress has the power to criminalize jaywalking in Toronto or eating foie gras in the south of France. Isn't that – am I wrong about that? Or doing a drug business in the Netherlands? Right. But if the Netherlands came to us and other countries came to us and said, hey, we have a real problem with drug dealing in our countries and Americans are going over and there's tremendous crime and violence because you Americans are coming to the Netherlands to do drugs, is that a different case is what I'm asking? Is it – does it matter whether the issue sought to be regulated by Congress is truly a matter of international concern, like child sex exploitation, or not a matter of international concern, like jaywalking? I have a bunch of responses to that. So let me just try to tick through them really quickly and then we can talk about any of them in particular. So as we outlined in the brief, the Article 1 power is not the only check on Congress's authority, on federal government's authority. So I don't think you have to rely solely on Article 1, Section 8, to say this isn't a limiting – this is an unlimited power, right? It's not unlimited. It's limited by the requirement for a plain statement of extraterritorial application. It's limited by the presumption against violations of international law. It's limited by, at least in the treaty power, a willing treaty partner. It's limited by the structure of the Constitution, vis-a-vis other explicit things. You're – let me – sorry to interrupt you, but you're agglomerating a series of powers, and that might work, but I'm not sure it does. Can you address the question I raised strictly under the Foreign Commerce Clause? Yeah, so the question is whether there's – Is there – and maybe your answer is there is no limiting principle strictly under the Foreign Commerce Clause, but there is a limiting principle under the agglomeration approach. So I think that if you're going to apply the Interstate Commerce Framework, there's certainly a limiting principle about there being an economic market that's being regulated, okay? So like – but then under RAJD, once we have the whole market – There's an economic market for foie gras, so you could have a federal law saying you can't eat foie gras in a foreign country. I think if we had a comprehensive regulatory scheme banning the eating of foie gras, like there is, for example, a comprehensive international regime banning the sale of ivory – yeah. I mean – and I want to point out about the drug laws in particular, and the last thing I was going to say was political considerations, which particularly in the realm of foreign relations are significant. It's both political and diplomatic, right? There are a number of drug treaties signed by countries all over the world, and they're limited, right? They don't extend to every internal private consumption of controlled substances. They don't extend to every controlled substance. And that's a political consideration, a diplomatic consideration by the President negotiating those treaties, by the Congress in talking the implementing legislation. And the fact, as the Supreme Court has recognized, I think in Black Mirror, but maybe in the prior case in Bowman, the idea that Congress hasn't gone so far doesn't mean that Congress can't go so far. But even if they can't do that, they can do this. But what is the limiting principle for the Foreign Commerce Clause? I think the limiting principle of the Foreign Commerce Clause is this structure of other things. That the Foreign Commerce Clause, like the Indian Commerce Clause, is engaged in this broader – I mean, as Rakeen says, this kind of sovereign-to-sovereign relationship, mediating that relationship, and it is plenary. Just like Congress's power over the Indian tribes is a plenary power, Congress's power to regulate the behavior of U.S. citizens abroad, just like every other country's power, to regulate the behavior of their citizens in our country. But it does appear that at least the trend seems to be that there is a limiting principle and that the conduct be commercial in nature. And so in this particular case, you run into the problem that you see, for example, in Rife, that that limiting principle doesn't apply to this type of personal conduct in a foreign country. I understand the concern. I think if we go back to the ultimate test, however, it doesn't hold up. We're talking about a rational basis for Congress to conclude that there is some effect under race on the market. And I think that the social science holds up there. I think if you look at the reality as seen in the cases, like Reid and Bianchi, that it is not crazy for Congress to conclude that every incidence of child sexual abuse affects the broader market. The District Court in Martinez explained about economics and prices. I think that's fairly elementary. So it's okay to have an over-inclusive law? I think it's permissible when there is a comprehensive regulatory regime to have the prophylactic measures that make the regulation effective. As Justice Scalia said in his race concurrence, that relying on Comstock, that is the necessary and proper clause. And I would point out additionally, and I see him over time, but the... The necessary and proper clause says in its very terms that it's not just Congress's ability to effectuate the Article I, Section 8 powers. It's Congress's authority to effectuate all the powers vested in the federal government under the Constitution. And if you look at the history, one of the primary drivers of adopting the Constitution was that the Articles of Confederation had failed, particularly in the realm of foreign relations. Therefore, I think it's completely reasonable, as the way foreign relations law has developed in the last two and a half centuries, to conclude that the political branches have this essentially plenary authority over foreign relations. And the idea that whenever a U.S. citizen goes abroad, the thing that they are doing... Yeah, so that's an interesting thing that I've thought a lot about in conjunction with this case, is there's some principle underlying this that, you know, if you want to do certain things in foreign countries that the United States Congress says are criminal, then turn in your passport. Stop being American. Is there some undercurrent of that here? Is that ultimately what's going on here, is that if you're an American, you have to submit to the American laws, not just within the 50 states, but when you're in Toronto or you're in Belgium. Yes, I mean, I think essentially, and I just want to... I gather from the conversation over the last 10 minutes that, whereas your friend said, in my drug example, the federal government would not have the power to criminalize the Americans' purchase and use of controlled substances and other ones, but Missouri would have that power. You disagree. You would say the federal government also has the power. I think the federal government certainly has the power, and I'm not at all sure that the state of Missouri has the power to... I mean, I don't want to speak for the state of Missouri, but... Is it because of the one voice problem? Yes. It's Japan lines. Yes, yes. And as your honor pointed out in the hypotheticals about Texas, Arizona, and California, I mean, I think that does raise serious foreign relations problem, and that's the entire point why foreign relations has been trusted both to the federal government, but not only to the federal government, to the political branches of the federal government. We're not making a non-dissolvability argument, but I think that the Supreme Court lays out pretty clearly in Zivotofsky v. Kerry why it's important that that be political considerations. And I think, again, that goes to the rational basis concept that Congress acting in this sphere, acting on foreign nations asking us to solve this problem, acting in 2016, 2013, when they amend C to add the resides prong at the behest twice of the United Nations Implementing Committee on the Optional Protocol, that we do more under Article 4 of the treaty to extend our jurisdiction over our citizens anywhere in the world. I think evidenced by the 2016 report by the State Department relying on subsection C to prove that we had done that. I think that that all shows is part of this foreign relations concept. And I just wanted to quote for you from the Blackmere case where they say that, nor can it be doubted that the United States possesses the power inherent in sovereignty to require the return to this country of a citizen resident elsewhere whenever the public interest requires it and to penalize him in case of refusal. And I think that case, the whole section of that case is talking about by virtue of the obligations of his citizenship, the United States retained its authority over him. And so to your Honor's point about there's this undercurrent of, if you want to be American, you're bound by our laws. I mean, you don't have to go that far to decide this case. I want to be super clear about that. But I'm just, I understand that I'm trying to understand the contours and the limiting principle and, you know, I mean, we're going to decide this case. But obviously, when we write presidentially, it affects other cases. That's... Of course. And I think that you're in safe ground relying on the Supreme Court's decisions there. And the Supreme Court has substantially relied on Bowman and Blackmere in other cases. And I think even if you look at a case like Morrison v. Bank of Australia, where they're concerned about the foreign cubed problem, right? Foreigners engaging in foreign transactions on foreign markets. That's not this case, right? This case is not even foreign squared, right? Because the victim is also a U.S. citizen. So I think under international law, we've got double authority, triple authority, because we've got the treaty. And international law, right, has developed for centuries to resolve the issues of sovereign to sovereign relations, right? Concerns. How do we respect each other? In the same way that federalism under the Constitution mediates that relationship between the federal government and the states. Under what circumstances might a defendant be charged under the resided-in prong without being charged under the traveled-in prong? So we've been able to come up with one circumstance, which would be a person who was born abroad to U.S. parents and derives citizenship in that way and never leaves a foreign country, never travels on a U.S. passport. I think technically that might fall within the ambit of the statute. But again, I want to be clear that that is very far from what we have here, where the defendant admitted at the plea colloquy that he traveled repeatedly between the United States and Haiti between 2014 and 2017 by commercial air carrier. It's the Supplemental Appendix 24. And he pleaded open to the plea agreement. I guess another way of saying it is how would the reside-in prong be facially valid? I think it's facially valid in the way it was applied in the Park case. The court relied there on the resides prong of the statute and it was reversing the dismissal of the indictment. And I think the court there was considering the resides prong exclusively. I think Reif was considering the resides prong exclusively and the Reif court rejected our argument that he was traveling. And I think there was a time when the Ninth Circuit in this split over whether they struck down cases without the resides prong that he subsequently came back up on appeal again and they upheld it because there was subsequent conduct. So I think that we have examples of courts upholding the resides prong and to make it facially unconstitutional, he has to show that all of those decisions are wrong and he hasn't even tried. So I think the fact that he hasn't even tried shows he knows that it's a losing argument. And I think that those opinions are well-reasoned. Before we leave the forum of Congress, because I do want to talk to you about the treaty power, but I'm going back as you were talking, answering one question, thinking about William F. Buckley about 50 years ago. William F. Buckley Jr. said, somebody asked him, did you ever smoke marijuana? He goes, yes, in Madagascar. It's not a violation of U.S. law. Well, is it a violation of U.S. law for American citizens to smoke pot in Madagascar? Not as far as I'm aware, currently. I mean, it's a statutory question. Okay. And in that case, there is obviously an economic component to a drug trade. And I keep coming back to if there is, appears to be a trend to there being a requirement of an economic component under the Lopez analysis, Lopez, Morrison, and Reich. How does this any different than what you just answered with respect to William F. Buckley Jr. smoking pot in Madagascar? So, I mean, is your question, could Congress penalize that? Yeah, could they? Yeah. I think probably. For the same reason that in Reich, Congress could prohibit the possession of a single marijuana plant in somebody's backyard that never leaves their house and isn't consumed by anybody else, that it's an international market. And even in the international context, we don't have the federalism concerns. There, the conduct was legal under California law, particularly if it's illegal under the foreign law, as this conduct is. I think that we're on pretty solid ground to say that anything affecting the market, that we have here, again, comprehensive regulation of a market. And we point out not just the treaty, we've got all sections of 2423C. We have the 2016 Megan's Law amending SORNA to require the marking of passports. Comprehensive regulation of this market. And I keep going back to what Justice Scalia said in Reich, that the necessary and proper clause gives Congress the power to make the regulation effective. And here we have multiple evidence from the legislative history, as well as what I think every court to have considered this statute says, is that this is closing a loophole in the law. Also, I want to point out that the F-1 conduct, this non-commercial conduct- Closes a loophole with respect to intent. Right. The first loophole- You had to have intent, see you don't. Yes. And F-1 conduct has been part of the statute since 1994. It gets recategorized. The whole thing is restructured in 2003. But this non-commercial, like don't have to prove the quid pro quo part of the statute, goes back to 1994. So it's not like this totally novel innovation that Congress thought, you have to do both parts in order to close the universe. If a missionary in the Sudan grows an acre of wheat for personal consumption, could Congress regulate that under Wickard and the Foreign Commerce Clause? I understand the intuitive bristling at that idea. I just want to work with the answer. Well, Wickard's like your uncle at the Thanksgiving party. Yes, you have to say yes. Yes, I do. And I'm going to say yes, but it's if there is a comprehensive regulatory regime. The only thing Congress can go out and say, like, it's foie gras in just France, like, whatever. I think you've got to say, like, foie gras everywhere, can't do it. And I want to point out again that as we- Well, I don't know why you would say that, because if France came to the United States, and said, you know, we have a long history of producing the world's finest foie gras, and the industry has been completely disrupted and overturned, and our farmers are ready to storm the proverbial Bastille, and the reason the whole market is messed up is because of you Americans. So couldn't Congress pass a law if Congress liked what France was saying, or we wanted for diplomatic reasons to mollify the French? Couldn't Congress pass a law? Why does it have to be- I think you're on stronger footing, as I not so subtly hinted with my earlier question. I think you're on stronger footing when you've got 175 nations saying, this is a worldwide problem. But I'm not sure, consistent with Judge Porter's question, why it's not enough for one country to reach out or, you know, identify a problem. Yeah, I think that it could be, right? If you're looking at this constellation of powers, right, going back to that Breckian idea that you put them together, it's not just one at a time, that that is the kind of regulation under the foreign powers, the foreign relations powers, collectively, that Congress might be able to do. But I want to be careful not to, like, overstate what the Supreme Court has approved. I don't know that there is a Supreme Court case that goes that far yet. But there are cases that deal with this comprehensive regulatory scheme idea, right? That's record, that's race, and that's what we have here. So you don't have to break any new ground to affirm this statute, even if there might be some- The answer to Judge Porter's question is, you have to say yes to weed in the Sudan being regulable, but if you're mistaken about that, you still win this case. Yes. Okay. You don't have to agree with me to have a win here. And if I could just point out one more thing, as the ideas in our brief talk about, that we have these comprehensive regulatory schemes over the sanctions regimes, and countries go in and out of being sanctioned kind of all the time, but those are considered acceptable. And that would apply, you know, if you go to Sudan and you engage, like you buy a coffee in Sudan and they process that, some bank processes that in U.S. dollars, I think that's a violation of the law. You know, we're sanctioning banks all the time for processing transactions in dollars because they're in state-sponsored terrorism countries. And that's, like, they don't have to be huge transactions. They don't have to be, like, passed through New York, right? If the process is in U.S. dollars, and that's foreign relations. That's the U.S. government's protection. Let's give you a chance to address the optional protocol issue. Judge Keflage, you know, I think Mr. Mazur was quite right. I mean, it was about as apologetic a win as you could get for the government in that case. And as I read his little coda to his opinion after his exegesis on foreign commerce, it was basically, Holland is wrongly decided, but we have to follow it. Is that all you have, or do you have something better than that? I agree that that's an accurate summary of his opinion. I think that Holland is not just Ipsy Dixit, right? I think Holland is on firm ground in this idea that it stems from the comprehensive foreign relation powers, the political branches of the federal government speak with one voice, across the world, and they can implement treaties as the international community agrees, as long as they don't, you know, as the D.C. Circuit points out in PARC, I think they have a good discussion of this, as long as there is some plain relationship between the statute and the treaty, which doesn't have to be explicit. Right, and what is that relationship here? It goes to that market question that we were talking about. So I think there's a couple of things in, three things, right? One is the market that we've already discussed. Two is the preamble to the treaty that discusses taking a holistic approach through all the countries to eradicate the drivers of this problem, which I think includes, as we discussed, the pedophiles gratify their urges however they can. And three is Article 4 of the treaty, that it's a permissive thing, but it says to extend jurisdiction over your citizens anywhere in the world. And I'm going to add a fourth, as the treaty says, at a minimum when it says the three types of conduct that countries should criminalize under it. Do we have enough facts to know that Mr. Clay is one of those pedophiles who would gratify his urges however he can? I don't think you need to. In the same way that I think the, you know, somebody could be growing their marijuana plant because it makes pretty flowers, and that's illegal under race. I don't think you have to be growing it for consumption, even personal consumption. And I think that goes to a pretty obvious idea that if you allowed a loophole like that, now everybody's got that defense and we got to prove beyond a reasonable doubt that you are and consider all the problems, not only of proof, but indeed, like, under the rules of evidence, the prejudice to the defendant, that kind of thing, and now we're talking about everything you've ever done. But the optional protocol doesn't expressly mention non-commercial conduct, does it? It doesn't. But as I pointed out, it's got this language about holistic approaches at a minimum and attaching to your nationals anywhere in the world. Again, I think it's up to Congress' rational relationship between the regulation that it's implementing and any of its powers. And under NFIB, the Affordable Care Act case, you know, the Chief Justice was pretty explicit that Congress doesn't have to put a label on its statutes. You don't have to say what you're doing. And even there, Congress was explicit. And they said it's a Congress statute. And the court said, no, it's not. It's a tax statute. It's constitutional. So I think that this idea that, like, wow, they didn't invoke it. Like, who cares? They don't have to. They usually do when you're implementing a treaty. They often do. But as I think the Belfast case makes clear, it doesn't have to follow the same language. That case, the statute is broader than the treaty. The Eleventh Circuit says that often that kind of statute is going to be more faithful to the intent of the treaty. That here, as there, we have a treaty that says a floor, not a ceiling. It's talking as a minimum. And again, we have not just the United States Congress making this judgment, but we have the United Nations Implementation Committee making this judgment that, like, we're not extending our jurisdiction far enough. And I think other countries also, well, I'm not going to speak to what other countries are doing. But again, it's a political judgment. It's a foreign relations judgment. And I know we've talked about the commerce power and the treaty power separately. But again, you don't have to do that. As Park did, as Brackeen did, the powers work together. And the synergy is Congress's power, right? Congress isn't pigeonholing itself into these things. And I would point out again that we have at the founding, the Geoffrey case talked about a treaty from 1800 between the U.S. and France about infestacy laws and who can inherit property. And there, the Supreme Court held that that treaty overrides Maryland state law, which is on quintessential state concern, federalism, about how you deal with family relations. And the federal government says, no, we get to decide because diplomatic considerations with France, French citizens can infestate, inherit property from Maryland residents. Supreme Court upholds that, says it's a valid exercise of the treaty power. I guess you could say that that's commercial because it's property transferring, but it's not for consideration. And again, it's this broad power of Congress and the president working together. It's checks and balances. It's two-thirds of the Senate. The implementing legislation needs both houses of Congress. There are very few self-executing treaties, especially these days. And so I think you have all of these checks built into the Constitution. It can't override the structure of government. It can't violate the Bill of Rights. That's really covert. And even there, like even that structure of government issue, there are treaties that impinge on state law. You know, that's Holland. That's Geoffrey. And so here, where we're not impinging on state law, where we're just dealing with other countries who are signing this treaty, who are coming to us and saying, please, please help us, you're the problem. I think it's completely rational for Congress to say, yes, we are, and we're doing something about it. And so I think the treaty power, when we talk about the treaty power, in the Constitution, it's the president's power to make the treaties. Congress is necessary and proper power to implement any power granted by the Constitution. But even the treaty power of the president has been interpreted, you know, the treaty power and the power to receive ambassadors is the textual language from which courts for centuries have inferred this expansive foreign relations powers to do diplomacy with other countries. So I think on that basis, that shows that we don't have to be, you know, picking and hunting for little words to say it's one, two, three words on the text of the Constitution, that the structure of the Constitution, as Blackmere says, the powers inherent in sovereignty  And I don't know why it would be true that the Constitution gives the United States as a whole, right, the federal government and the states as a whole, less power than every other country in the world. That seems to me something that the founders wouldn't have wanted that they didn't do. And that the question about the Constitution in like vis-a-vis other countries is not about do we have the same powers other countries have? It's a question of which part of the government has those powers. And I think on that question, the Constitution is clear that it's the political branches of the federal government. All right. Thank you very much. Thank you. We'll hear rebuttal from Mr. Mazur. I'm going to ask you to address another hypothetical of sorts. Let's assume an American goes over to the Congo and participates in a coup and succeeds in upending the government. In fact, the American is the one that kills the president of the Congo. Can that American be prosecuted in a U.S. court upon his return to the United States? It's entirely possible, Your Honor, that there is a statute that would regulate that type of conduct. And my mind goes to some of the statutes related to terrorism and things of that nature. But with respect to if what you're asking is does the travel component of that give Congress the authority to regulate that conduct? The answer is no. And I think you, Judge Hardiman and Judge Ambrose both asked for a limiting principle from the government on that point. And whether travel alone, standing by itself, separate from any illegal conduct is enough to exercise the foreign commerce. The illegal conduct is the murdering of the president. But travel could be the hook that gives Congress the power to regulate it. I don't think it is, Your Honor. I think that the travel hook operates in the realm of under Lopez the exercising control over maybe it's the instrumentalities, maybe it's the channels. But ultimately, it's regulating an individual as they are moving through, in this case, foreign commerce. And there, depending on when any sort of intent to lead that coup arose, I don't think that Congress would have the authority to regulate that. And I apologize for- You see the problem, right? Because if the American's unsuccessful in the coup, then the Congolese are probably going to deal with him. But if he succeeds in the coup, they're going to have no rationale to prosecute him, right? He just murdered somebody, and he's going to get off with it because he's with a group of people that are happy that he murdered the president. Well, I think there are pieces of international law that would cover that type of political and assassination attempt or potentially under the treaty power. Correct. You're saying whatever it is, it might allow it's not the foreign commerce clause. It's not the foreign commerce clause. And it may not, depending on the treaty structure related to that, may not be the United States' responsibility to be the world's police officer to go out and prosecute that person. Well, okay. But the United States might have some degree of moral objection to Americans going and murdering heads of other states. So one would hope. Race presents a problem for you, right? Give us your best argument as to why it's not Justice Thomas' view that race's homegrown product was commerce, but it's the opinion of the court. And how do you get around it here? I think this case, Your Honor, falls more squarely in the confines of Lopez and Morrison in the sense that you have a regulation over conduct as opposed to a regulation over the use of a fungible item. And that's the argument we outlined in our brief, Your Honor, where Race and Wickard both dealt with goods that would ultimately enter the stream of commerce and were non-distinguishable from any other. The conduct here is much more specific and far less economic. And this is Judge Hartz's dissent in Durham, specifies this distinction between economic and... I'm sure I accept your premise that it would have entered the stream of commerce. I mean, Race is consuming on her own property. She's doing an action on her own property. And the theory is that, well, if she weren't able to do that on her own property, she'd go do it somewhere else, right? It's Wickard. Right, she would purchase it elsewhere. Same thing with Wickard, right? If you're not growing your own wheat, you've got to go get it somewhere else. Well, the government's argument here is that people who sexually assault children, if they don't have people they can do it to in their own home or their own neighborhood, non-commercially, they're going to go do it commercially. It seems to be a parallel argument. I'm not sure it is. Your response is that, well, one involves conduct toward people and the other involves selling a thing? Correct. And that's Lopez. That's the domestic violence-type conduct, I'm sorry, in Morrison. But beyond that, Your Honor, I think on an as-applied basis here, and Judge Porter, to your point about the facts that we have, that's pages 49 to 52 of our brief discuss the situational offender issue. And here, I think, Judge Hardiman, what you've underscored, and this not only happened here at oral argument with counsel for the other side, but also on page 29 of the government's conduct, which is unquestionably non-commercial into some version of commercial conduct. And so you have speculation about what could happen and what might happen. Those are not, Your Honor, in this case. That's the foreign commerce clause, but what about the treaty power? In other words, isn't that a whole different theory for why this should be upheld, that you have an international convention, if you will, that we're trying to get rid of a molestation of children, and the U.S. signs on by law to that particular treaty? That's right, Judge Ambrose. But as I mentioned, the treaty was not addressing this type of conduct. It doesn't expressly address non-commercial conduct. Correct. But how do you get around Missouri v. Holland, whether you like it or not? I think the approach there is, quite simply, that the statute 2423C goes too far beyond what the scope of the treaty allows and calls for. And as a result, you slide down the slippery slope that, as Judge Keflage referenced in the Reif opinion, about using a treaty as a portal to exercising a global police power. There has to be a limiting factor there, and there is none here. That was his critique of Holland. Yes. I'm sorry? That was his critique of Holland. Yes. Which he then followed. Which we need to follow. I mean, that argument's going to have to be made at the next step with the Supreme Court. Perhaps it does, but I think, ultimately, the question is whether Holland is deemed to be binding on this court, as it relates to this. Otherwise, it's lawless if we don't follow it. Unless it's not binding, because it's just a throwaway line of dictum. Correct. All right. I think we understand your position, Mr. Mazur. Do you have any other pressing issues you need to, or are your feet telling you it's time to? I don't, Your Honor. Thank you. All right. Well, the court appreciates your stamina and the stamina of Ms. Ralston, and we'll take the matter under advisement. Thank you very much.